IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LASARO ABARCA,

          Plaintiff,

     v.                                Case No.  16 C 2494

CHICAGO POLICE DETECTIVES             Judge Harry D. Leinenweber
TANNIA FRANCHINI #20845,
MOREEN HANRAHAN #20565,
CITY OF CHICAGO, and
ASSISTANT STATES ATTORNEY
ANDREA KERTEN,

         Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment
[ECF No. 26].  For the reasons herein, the Motion is granted.

## I.  BACKGROUND

Plaintiff Lasaro Abarca ("Abarca") is a Spanish-speaking
Illinois citizen who was suspected and later charged for
sexually abusing his daughter.  He was acquitted at trial of all
charges.  (Pl.'s Resp. to Defs.' Fact Statement ¶ 80.)

Defendant Tannia Franchini is a detective in the Chicago
Police Department in the Special Investigations Unit and was
assigned to Abarca's case on May 14, 2013. (Id. ¶¶ 16-17.)
During an interview with Abarca's minor daughter and her mother,
Abarca's daughter told the investigators that Abarca placed his

hand inside her underwear and touched her private parts. (*Id.* ¶¶ 18, 22.) The child's mother corroborated her daughter's statements. (*Id.* ¶ 26.) Based on the information from this interview, Detective Franchini authorized the arrest of Abarca. (*Id.* ¶ 27.)

Abarca was arrested on the morning of May 27, 2013 and transported to the Chicago Police Department 19th District Station. (*Id.* ¶¶ 28-29.)

Before discussing the details of the subsequent interrogation, Abarca's English skills are relevant. Abarca was born in Mexico where he completed high school. (Defs.' Resp. to Pl.'s Add'l Facts ¶ 1.) He arrived in the United States as an adult in 1991 and attended two months of English courses. (Pl.'s Resp. to Defs.' Fact Statement ¶¶ 6-7.) He has lived here ever since, over 25 years. (*Id.*) In all six of Abarca's jobs in the United States, he spoke Spanish the majority of the time. (Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 2-5.) He speaks Spanish with his kids, took his driver's license exam in Spanish, and spoke a mix of Spanish and English with his daughter's mother. (*Id.* ¶¶ 7-8.) Abarca states that he can read English, yet barely understands it. (Pl.'s Add'l Facts ¶ 9.)

At approximately 7:45 p.m. on the day of his arrest, Detective Franchini brought Abarca to an interview room. (Pl.'s

Resp. to Defs.' Fact Statement ¶ 30.) Abarca's handcuffs were removed and Detective Franchini asked him in Spanish whether he preferred to speak in English or in Spanish, since Detective Franchini is fluent in both. (*Id.* ¶ 31.) Abarca chose to speak in English. (*Id.* ¶ 32.) According to Abarca, he hoped it would speed up the questioning process. (*Id.* ¶ 38.) Detective Franchini told Abarca that if at any point he did not understand something in English he should let her know so she could repeat it in Spanish. (*Id.* ¶ 33.)

After Detective Franchini read Abarca each *Miranda* right in English, Abarca said (in English) that he understood. (*Id.* ¶¶ 34-35.) Detective Franchini further relates that it was apparent to Detective Franchini that he could understand English based on his answers to her questions over the course of the hour-long interrogation. (*Id.* ¶¶ 33, 36, 40.) In contrast, Abarca maintains he did not understand what she was saying. (Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 15-16.) After Detective Franchini finished reading his rights, Abarca agreed in English to speak with her. (Pl.'s Resp. to Defs.' Fact Statement ¶ 37.)

When Detective Franchini first asked Abarca about inappropriately touching his minor daughter, Abarca denied doing so. (*Id.* ¶ 42.) He simply repeated: "No, I didn't do anything." (Defs.' Resp. to Pl.'s Add'l Facts ¶ 22.) However,

Abarca eventually admitted that when he was "rubbing [his minor daughter's stomach], his hand slipped underneath her pants and . . . he touched her vagina." (Pl.'s Resp. to Defs.' Fact Statement ¶ 43.) He said he did so because he was curious to see if she had pubic hair. (*Id.* ¶ 44.) Abarca admits saying this to Detective Franchini but maintains it is simply not true. (Pl.'s Add'l Facts ¶ 13.) He only admitted to inappropriately touching his daughter, he says, because he was tired, frustrated, and wanted to go home — something Detective Franchini allegedly told him he could not do until he admitted to touching his daughter in a sexual manner. (*Id.* ¶¶ 20, 23-24.) Defendants deny that Detective Franchini ever promised Abarca that he would be "let go" if he confessed. (Defs.' Resp. to Pl.'s Add'l Facts ¶ 24.)

After Abarca confessed, Assistant States Attorney ("ASA") Andrea Kerten came in to speak with him. ASA Kerten asked Abarca to sign a written statement reaffirming his confession; he agreed. (Pl.'s Resp. to Defs.' Fact Statement ¶ 60 (facts denied without any record citation will be deemed admitted. *See,* Local R. 56.1).) Before signing the statement, ASA Kerten asked Abarca to read the first paragraph of the statement out loud to ensure he understood English and was capable of reviewing of the rest of his statement. (*Id.* ¶ 61.) After he

read it back without any difficulty, ASA Kerten read the rest of the statement, telling him that he could stop her to make any corrections. (*Id.* ¶ 63.) The statement includes a sentence affirming that he can read and write in English. (Defs.' Resp. to Pl.'s Add'l Facts ¶ 9; Pl.'s Resp. to Defs.' Fact Statement ¶ 62.) After Abarca signed the statement, he asked detective Franchini: "Can I go now?" (*Id.* ¶ 64; Pl.'s Add'l Facts ¶ 33.) Abarca claims he never understood what he was signing. (Pl.'s Add'l Facts ¶¶ 26-27, 32.)

Various facts of the interrogation are undisputed. Abarca knew Detective Franchini was a police officer and that he was being asked questions about a possible crime. (Pl.'s Resp. to Defs.' Fact Statement ¶ 41.) Abarca never indicated that he wanted to speak in Spanish or that he did not understand what Detective Franchini was saying. (*Id.* ¶¶ 39, 46.) Detective Franchini never physically threatened Abarca. (*Id.* ¶ 49.) Additionally, Detective Franchini testified that Abarca never made any complaints of discomfort or fatigue and never requested medical aid; Abarca is unable to remember anything to the contrary. (*Id.* ¶¶ 45, 66.) When ASA Kerten spoke to Abarca outside the presence of the detectives to discuss his treatment, he said he was treated fine and had no concerns. (*Id.* ¶ 65.) He

also said he was not promised anything or threatened in order to make his statements to Detective Franchini. (*Id.* ¶ 79.)

Abarca was subsequently charged with Aggravated Criminal Sexual Abuse in violation of 720 ILCS 5/11-1.60(b). (*Id.* ¶ 67.) After hearing testimony during motion to suppress proceedings, the criminal court judge denied Abarca's motion, finding his confession voluntary and his waiver valid. (*Id.* ¶ 70.)

At his criminal trial, Abarca testified that he did not sexually abuse his daughter: "Members of the Jury, with all my respect, never in my life, I have never touched any of my kids. I have seven children, and I have three children with [my daughter's mother]. Never in my life, I have never touched [my daughter]." (Defs.' Resp. to Pl.'s Add'l Facts ¶ 34.) The jury found Abarca not guilty on February 20, 2015. (Pl.'s Resp. to Defs.' Fact Statement ¶ 80.)

On February 22, 2016, Abarca filed a § 1983 action against the City of Chicago, ASA Kerten, Detectives Franchini and Hanrahan pursuing theories based on malicious prosecution, violation of his Fifth Amendment, due process, and *Miranda* rights, and respondeat superior and indemnification. (*See, generally* Compl., ECF No. 1.) The parties agreed to the dismissal of ASA Kerten and Detective Hanrahan leaving only two Defendants — the City of Chicago and Detective Franchini — and

three counts remaining. Those counts are: Count I (Fifth Amendment, due process, *Miranda* claim), Count IV (respondeat superior and indemnification), and Count V (malicious prosecution). (*Id.*; Agreed Order of Dismissal, ECF No. 25.) The Defendants now move for summary judgment on Abarca's claims.

## II. <u>ANALYSIS</u>

Summary judgment is appropriate when the admissible evidence reveals no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party: here, Abarca. *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015) (citation omitted).

### A. CONSTITUTIONAL CLAIMS

#### 1. *Waiver of Miranda Rights*

Abarca argues that his limited English skills prevented him from making a knowing and voluntary waiver of his *Miranda* rights. Defendants contend that this Court cannot reach this question because it has already been decided by the criminal court. Thus, as an initial matter, the Court must first decide whether to address the merits.

*a.  Collateral Estoppel*

During the criminal case, the criminal court held a suppression hearing to determine whether Abarca knowingly and voluntarily waived his *Miranda* rights during his interrogation.

Defendants rely on *Hernandez v. Sheahan,* 711 F.3d 816, 818 (7th Cir. 2013), to argue that Abarca is collaterally estopped from relitigating whether he knowingly and voluntarily waived his *Miranda* rights because the criminal court already ruled he had.  In *Hernandez,* the Seventh Circuit held that the district court was barred from considering whether the defendant's statement was voluntary where the state court had already ruled that it was. *Id.*  Yet the *Hernandez* rule has exceptions:  the pertinent one here being that a defendant will not be collaterally estopped if he or she had no opportunity to appeal the first ruling.  *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1020-23 (7th Cir. 2006).  In *Sornberger,* the Seventh Circuit reversed a district court's ruling that plaintiff's earlier, unsuccessful suppression motion collaterally estopped her from relitigating *Miranda*-waiver in a later § 1983 action. *Id.*  The court reasoned that limits on collateral estoppel arise from problems of appealability rather than the nature of the subsequent proceeding and thus apply to all subsequent actions — both civil and criminal:

> [A] defendant, unlike the prosecution, is not allowed
> an immediate appeal from an adverse ruling upon a
> motion to suppress. He cannot review that ruling
> until after he has been convicted and sentenced. And
> for a variety of reasons he might not wish to appeal,
> or as in the case of an acquittal at the first trial,
> he might not be able to do so.

*Id.* at 1022 (quoting *People v. Hopkins,* 284 N.E.2d 283, 284 (Ill. 1972)). As such, the Seventh Circuit ruled that the Supreme Court of Illinois would extend the collateral estoppel exception to a later § 1983 action where the plaintiff had no opportunity to appeal in the first instance. *Id.* That is the case here. Although *Hernandez v. Sheahan,* 711 F.3d 816, 818 (7th Cir. 2013), was decided after *Sornberger,* it does not question or overrule the exceptions delineated in *Sornberger.* Thus, *Sornberger* governs this case. Abarca was acquitted in his criminal trial, meaning that he had no opportunity to appeal the state court's ruling on his suppression motion. Hence, the state court's ruling does not bar this court from considering the question of whether his confession complied with *Miranda.*

### b. Merits of Abarca's Alleged Waiver

Defendants argue that they are entitled to summary judgment because Abarca knowingly and voluntarily waived his *Miranda* rights prior to giving an incriminating statement. Abarca contends that his limited English skills prevented him from doing so. "A waiver of *Miranda* warnings must be both knowing

and voluntary." *United States v. Tellez,* 586 F. App'x 242, 244 (7th Cir. 2014) (citations omitted).

"Generally, the courts will hold that a defendant's waiver is knowing if he understands that he can refuse to talk to the people asking him questions or stop the questioning once it begins; that the people asking him questions are not his friends but are police or law enforcement personnel who are trying to show he is guilty of a crime; that he can ask for and get a lawyer who will help him; and that he does not have to pay for that lawyer." *Collins v. Gaetz,* 612 F.3d 574, 588 (7th Cir. 2010) (citations omitted). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the *Miranda* warnings that the courts have found an unintelligent waiver. One example is a defendant whose command of English is so poor that the police might as well have been speaking gibberish." *Id.* (citing *United States v. Alarcon,* 95 Fed. Appx. 954, 955-57 (10th Cir. 2004) (defendant understood only "bits and pieces" of English and often pretended to understand English out of embarrassment and a desire to cooperate); *United States v. Garibay,* 143 F.3d 534, 537-38 (9th Cir. 1998) (no evidence that defendant spoke enough English to understand warnings, and several witnesses testified that he spoke only a few words of English)). "If it is apparent

to police that a defendant cannot speak English, attempting to extract a waiver of his rights under *Miranda* is obviously an abusive police practice that would render a waiver involuntary." *United States v. Sanchez,* No. 12-20008, 2013 WL 4806992, at *5 (C.D. Ill. Sept. 9, 2013) (citation omitted).

Importantly, Detective Franchini gave Abarca the choice to speak in English or Spanish during the interrogation: Abarca chose English. Abarca cannot bury his head in the sand by choosing to speak in a language that he does not understand and then claim a constitutional violation because he didn't understand the *Miranda* waiver recited to him in the language that *he* expressly chose.

Further, even if Abarca did not waive his constitutional right by expressly choosing to speak in English, the result would be the same. Courts have concluded that English-spoken responses and English skills poorer than Abarca's were sufficient to render a knowing waiver. *See, e.g., Perri v. Dir., Dep't of Corrs. of Ill.,* 817 F.2d 448, 452-53 (7th Cir. 1987) (concluding that native Italian knowingly waived *Miranda* rights, even though he received warnings in an unfamiliar Italian dialect, because he responded in English that he understood them); *see also, United States v. Guay,* 108 F.3d 545, 549-50 (4th Cir. 1997) (holding French-speaking arrestee

knowingly waived rights where he told an officer that he could understand English if spoken slowly); *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir. 1989) (holding that arrestee made knowing waiver despite broken English and occasional lapses into Spanish).

In *United States v. Tellez,* 586 F. App'x 242, 244-45 (7th Cir. 2014), the Seventh Circuit affirmed the district court's finding that the defendant understood enough English to waive knowingly and intelligently his *Miranda* rights. The Court found four facts relevant to that determination: the agent asked the defendant in Spanish if he understood English, to which the defendant replied affirmatively; the defendant continually spoke and answered questions in English rather than Spanish; the defendant had lived in the United States for over 15 years; and the defendant gave detailed answers in English to open-ended questions in his interactions with officials. *Id.* All of these facts are true in Abarca's case as well. *Accord, United States v. Sanchez,* No. 12-20008, 2013 WL 4806992, at *5 (C.D. Ill. Sept. 9, 2013) (finding *Miranda* waiver based on similar facts, including that defendant's answers to investigators' questions demonstrated understanding).

Notably, the facts before this Court are even stronger than those before *Tellez* and *Sanchez*. In those cases, the

investigators asked if the defendants understood English and the defendants' affirmative responses and subsequent answers to questions demonstrated they did. *See, Tellez,* 586 F. App'x at 244-45; *Sanchez*, 2013 WL 4806992, at *5. That was sufficient. *Id.* Here, Detective Franchini not only asked Abarca if he understood English, she gave him the option to speak in either English or Spanish. He chose English. (Pl.'s Resp. to Defs.' Fact Statement ¶ 31-32.) Further, Detective Franchini told Abarca that if at any point he did not understand something he should let her know so she could repeat it in Spanish. (*Id.* ¶ 33.) At no point did Abarca indicate that he wanted to speak in Spanish or that he did not understand what Detective Franchini was saying. (*Id.* ¶ 39.) Just as in *Sanchez,* the conversation between Abarca and Detective Franchini demonstrated that Abarca understood Detective Franchini's questions. *See,* 2013 WL 4806992, at *5.

And if that were not sufficient, ASA Kerten required Abarca to read the first paragraph of his statement out loud to her in English to confirm that he could read and understand English. (Pl.'s Resp. to Defs.' Fact Statement ¶ 61.) There is no dispute that he was able to do so, which indicates that Abarca's English skills were not so low that Detective Franchini "might as well have been speaking gibberish." *Collins,* 612 F.3d at 588

(citations omitted). Abarca also signed a statement attesting that he can read and write in English. (Pl.'s Resp. to Defs.' Fact Statement ¶ 62.)

These facts are consistent with Abarca's background. Abarca has lived in the United States for over 25 years and when he first arrived, he attended two months of English courses. (*Id.* ¶¶ 6-7.) Still, Abarca contends that although he can read, he barely understands English. (Defs.' Resp. to Pl.'s Add'l Facts ¶ 9.) However, this assertion alone is not enough to create a material fact issue. As Abarca admits, at no point during his interactions with Detective Franchini or ASA Kerten did he indicate that he did not understand, nor did any of his answers to their questions demonstrate confusion. (Pl.'s Resp. to Defs.' Fact Statement ¶ 39.) Following *Tellez* and *Sanchez,* the Court finds that Abarca knowingly and intelligently waived his *Miranda* rights after hearing his rights read to him in English and subsequently waiving them.

### 2. Coercion

Administering proper *Miranda* warnings does not end the Fifth Amendment inquiry. *Aleman v. Vill. of Hanover Park,* 662 F.3d 897, 906 (7th Cir. 2011). "*Miranda* has been said to distract judges from the propriety of the interrogation that follows a waiver of *Miranda* rights." *Id.* (citation omitted). A

confession may still be the product of coercion, even if *Miranda* warnings are given; such is the case where physical abuse occurs after the defendant has already waived rights under *Miranda*. *See, Dassey v. Dittmann,* 877 F.3d 297, 303 (7th Cir. 2017) (*en banc*) ("[P]rohibitions on physical coercion are absolute.").

"A confession is voluntary if 'it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *Hicks v. Hepp,* 871 F.3d 513, 527 (7th Cir. 2017) (quoting *United States v. Vallar,* 635 F.3d 271, 282 (7th Cir. 2011)). To determine whether a confession is voluntary, courts analyze the totality of the surrounding circumstances from the perspective of a reasonable person in the suspect's position, examining both the characteristics of the accused and the details of the interrogation. *Id.* (citations omitted). In doing so, courts consider "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.* (quoting *United States v. Sturdivant,* 796 F.3d 690, 695 (7th Cir. 2015)).

"Police coercion is a prerequisite to finding any confession to be involuntary. Physical abuse may be the ultimate coercion, but the Supreme Court has long acknowledged the potency of psychological coercion as well." *Hurt v. Wise,* 880 F.3d 831, 845 (7th Cir. 2018) (citations omitted). "Whether police have employed sufficiently coercive tactics to render a confession involuntary is a legal question." *Id.* at 846 (citing *United States v. D.F.,* 115 F.3d 413, 417-19 (7th Cir. 1997)).

Defendants argue that they are entitled to summary judgment because Abarca's confession was not the product of coercion as a matter of law. Abarca is an adult without any mental handicap. He knew Franchini was a police officer and that he was being asked questions about a possible crime. (Pl.'s Resp. to Defs.' Fact Statement ¶ 41.) Franchini never used physical violence or threats of violence against Abarca or his family and there is no evidence that Abarca made any complaints of discomfort or fatigue or that he requested medical aid. (*Id.* ¶ 45.) In total, he was at the police station for one full day, only an hour-long portion of which involved the interrogation. (*See, id.* ¶ 28-30.) As discussed in depth above, his English skills were sufficient to understand what was being said to him. Abarca argues he did not eat all day, but never asserts he was deprived of anything; in fact, he admits that he was allowed food, drink,

or restroom breaks. (*See generally,* Pl.'s Add'l Facts, ECF No. 40; *see also,* Pl.'s Resp. to Defs.' Fact Statement ¶¶ 50, 66.) These circumstances do not come close to establishing Abarca's "will [was] overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961) (citation omitted). However, the analysis involves the totality of the circumstances and one crucial fact remains.

The most critical (and disputed) fact is Abarca's assertion that Franchini told Abarca that he would not be "let go" until he confessed. It is Abarca's position that this factual dispute precludes summary judgment. Abarca testified that he "confessed" to Detective Franchini only because Franchini told him that she was not going to let him go until he told her why he had touched his daughter. (Pl.'s Add'l Facts ¶¶ 20, 24). Indeed, immediately after Abarca signed his written statement, he asked Detective Franchini: "Can I go now?" (*Id.* ¶ 33).

Abarca asserts that it was this coercive statement that caused him to confess falsely to a crime he did not commit. (*Id.* ¶ 13.) There is a factual dispute as to whether Franchini ever made statements to that effect during the interrogation:

> [Abarca's Trial Testimony]

> Q: And did [Detective Franchini] say anything else to you?

A:   Yes. Before that she told me that she was not going to let me go until I told her why I had touched by daughter.

[. . .]

Q:   She told you what?
A:   She said that she wasn't going to let me go until I basically told her that I had touched her.

[. . .]

Q:   What happened next?
A:   I do not know what a statement is. This is the first time that I had been interrogated by police, and I felt like whatever I did after that I was going to do it so I could go home.
Q:   Did you think you had done anything wrong?
A:   No, on the contrary. I had already told her what she wanted to hear. I just wanted to go home.

[. . .]

Q:   Now, you said that you told Detective Franchini that you touched your daughter's vagina to please her, correct, to please Detective Franchini, correct?
A:   Yes, she had already told me that she was not going to let me go until I told her.

[. . .]

Q:   And you told her that in order for her to allow you to leave, correct?
A:   Yes, because I was tired of being locked up for 15 hours, and she was asking dirty questions.

[Detective Franchini's Trial Testimony]

Q:   He initially denied these allegations again, right?
A:   He initially denied, yes.

- 18 -

<pre>
     Q:   And you told him that during this
          interrogation that because you didn't
          believe him, you weren't going to leave?
     A:   That's not true.
</pre>

Trial Testimony, No. 13 CR 12509, Circuit Court of Cook County, Criminal Division, Feb. 19, 2015. Thus, a factual dispute exists as to whether Detective Franchini told Abarca that he would not be released unless he admitted touching his daughter inappropriately. The next step is to determine if it is material. If, taking all the factual inferences in favor of the non-movant — here, Abarca — still allows summary judgment as a matter of law, this case can be resolved on the papers. If not, the summary judgment motion must be denied and this factual issue resolved at hearing.

"Courts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession coerced and thus involuntary." *Aleman v. Vill. of Hanover Park,* 662 F.3d 897, 906 (7th Cir. 2011) (collecting cases). "Although 'the law permits the police to pressure and cajole, conceal material facts, and actively mislead,' it draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free." *Hadley v. Williams,* 368 F.3d 747, 749 (7th Cir. 2004) (quoting *United States v. Rutledge,* 900 F.2d 1127, 1131 (7th Cir. 1990)). Such promises of immunity are sufficient

to render a confession involuntary. *See, Escobedo v. Illinois,* 378 U.S. 478, 483-84 (1964) (reversing conviction where defendant was promised that, if he confessed, he could go home and would be granted immunity). Yet although "[f]alse promises may be evidence of involuntariness, at least when paired with more coercive practices or especially vulnerable defendants as part of the totality of the circumstances," a mere promise to be released from the police station without a guarantee of immunity does not necessarily rise to coercion. *Dassey v. Dittmann,* 877 F.3d 297, 304 (7th Cir. 2017) (*en banc*) ("False promises to a suspect have similarly not been seen as *per se* coercion." (citations omitted)).

Recently, in *Dassey v. Dittmann,* the Seventh Circuit *en banc* held that Wisconsin's appellate court reasonably applied United States Supreme Court precedent where it found defendant's confession was voluntary. *Id.* at 316-18. Notably, the defendant in *Dassey* was offered a similar promise as the case at bar: "[Defendant] was reassured across two days of interviews that being 'honest' would allow him to go 'free.'" *Dassey v. Dittmann,* 877 F.3d 297, 330 (7th Cir. 2017) (Wood, J., dissenting). The facts of *Dassey* are much more extreme than the case at bar — the defendant was an intellectually impaired child with no parent present and subject to an interrogation that

spanned multiple hours.  Yet still, the court upheld the state court's finding that the confession was not coerced. *Id.* at 337.

Granted, the procedural posture in *Dassey* is quite different from this case.  There, the case was in habeas proceedings and the stringent standard from the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, applied.  No such standard is at play here. However, this recent binding precedent offers guidance in conjunction with other cases outside this Circuit in a more similar procedural posture.

Two district court cases with remarkably similar facts have both found the confessions at issue to be voluntary.  In *United States v. Dunkelberger,* the district court held a confession voluntary where the investigator told the defendant that she should sign the inculpatory statement so that she could go home to supper, and that once she signed it, it would all be over. The district court reasoned that, even assuming the facts as the defendant put forward, "[a] comment about going home to supper is not sufficient to overpower the will of a person who is accused of embezzlement and facing a possible felony conviction." *United States v. Dunkelberger,* No. CR. 10-40064-01, 2010 WL 4868187, at *6 (D.S.D. Nov. 23, 2010).  Similarly, in *United States v. Lee,* the district court held the defendant's

confession voluntary where the investigator told the defendant that she had to write the inculpatory statement in order to go home. *United States v. Lee,* No. 08-20309, 2011 WL 6307878, at *3 (E.D. Mich. Dec. 15, 2011). The Court concluded that the investigator's conduct was not objectively coercive and that the evidence did not show the defendant's will was overborne, noting that the written statement repeated some of her earlier admissions, undermining any claim that her statement was induced by a promise of release. *Id.* Multiple cases with a similar statement by investigators have found the subsequent confession voluntary. *See, e.g., United States v. Ferrara,* 377 F.2d 16 (2d Cir. 1967) (telling defendant that if he cooperated with the government, he would be released on a reduced bail); *United States v. Robinson,* 698 F.2d 448, 455 (D.C. Cir. 1983) (telling defendant that if he cooperated, his arrest would be delayed so he could straighten out his personal affairs); *United States v. Bazzelle,* No. 14 CR 50067-2, 2015 U.S. Dist. LEXIS 131886, at *19 (N.D. Ill. Sep. 30, 2015) (telling defendant that he was going to be charged but that if he agreed to cooperate, the charges against him would be delayed so he could order his affairs).

Even if the facts are as Abarca contends, and Detective Franchini said he could only go home once he admitted to

inappropriately touching his daughter, those circumstances do not even reach the level of those in *Lee* or *Dunkelberger*. 2011 WL 6307878, at *3 (finding confession voluntary); 2010 WL 4868187, at *6 (same). These cases stand for the proposition that this type of statement, without more, is insufficient to show the confession is coerced. "[V]ery few incriminating statements, custodial or otherwise, are held to be involuntary, though few are the product of a choice that the interrogators left completely free." *United States v. Rutledge,* 900 F.2d 1127, 1129 (7th Cir. 1990). "The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." *Id.* at 1130. As long as the defendant "retained the presence of mind to evaluate the options he believed were available to him," there is no coercion. *United States v. Lord,* No. 93 CR 626, 1994 U.S. Dist. LEXIS 6069, at *11 (N.D. Ill. May 6, 1994). "Only a threat or promise sufficient to overwhelm the defendant's ability to make rational choices would be sufficient to cause a confession to be deemed involuntary." *Id.*

Abarca relies on the Supreme Court's language in *Brady v. United States* interpreting *Bram*:

> Bram dealt with a confession given by a defendant in custody, alone and unrepresented by counsel. In such circumstances, **even a mild promise of leniency** was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess.

*Brady v. United States,* 397 U.S. 742, 754 (1970) (emphasis added). Since *Brady* however, this statement has been interpreted narrowly: *Bram* did not establish a *per se* rule, but merely affirmed that promises of leniency should weigh heavily in the totality of the circumstances analysis. *See, Cole v. Lane,* 830 F.2d 104, 109 (7th Cir. 1987) (rejecting *per se* rule that a promise of leniency required a finding of involuntariness).

Abarca also cites to *Lall* and *Streetman,* but to no avail. *United States v. Lall,* 607 F.3d 1277, 1283-84 (11th Cir. 2010), is not analogous. In *Lall,* the Court held that the defendant's waiver of his *Miranda* rights was ineffective because after his *Miranda* warnings were given, the investigator immediately contradicted them by promising that the government would not pursue any charges. Here, there was no promise of immunity. Similarly, *Streetman v. Lynaugh,* 812 F.2d 950, 956 (5th Cir. 1987), is not analogous. The facts of that case are much more extreme: the defendant alleged that he confessed only after authorities threatened him and his family with physical

violence, assured him that information provided would not be used against him, stated that their goal was to get information to charge other people, and promised that the defendant would be promptly released. *Id.* Although Abarca is correct that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary," the "promise" in this case, even construed as such, does not rise to the level of coercion required by the case law. *Id.* at 957.

This analysis is not to discount the very serious issue at play in this case — potentially a false confession. False confessions undermine the credibility and fairness of our justice system. *See, Dassey v. Dittmann,* 877 F.3d 297, 332-33 (7th Cir. 2017) (Wood, J., dissenting); *cf. Miranda v. Arizona,* 384 U.S. 436, 455 n.24 (1966). Abarca's acquittal lends support for his statement that he did not actually commit the act he confessed to. Granted, the United States Supreme Court has issued contrary directions on whether the reliability of a confession should be considered in the analysis of coercion at all, *see, Dassey v. Dittmann,* 877 F.3d 297, 317 (7th Cir. 2017) (collecting cases), but regardless, the fact that certain interrogation tactics may (and do) lead to false confessions was emphasized by the three judge dissent in *Dassey*:

> In a world where we believed that "innocent people do
> not confess to crimes they did not commit," we were

willing to tolerate a significant amount of deception by the police. Under this rubric, the thinking went, the innocent person (or at least the vast majority of healthy, sane, innocent adults of average intelligence) would not confess even in response to deception and cajoling. And so our case law developed in a factual framework in which we presumed that the trickery and deceit used by police officers would have little effect on the innocent.

[. . .]

But what do we do when the facts that supported our 'modern constitutional standards' come from a fifty-year-old understanding of human behavior, and when what we once thought we knew about the psychology of confessions we now know not to be true? Our long-held idea that innocent people do not confess to crimes has been upended by advances in DNA profiling. We know now that in approximately 25% of homicide cases in which convicted persons have later been unequivocally exonerated by DNA evidence, the suspect falsely confessed to committing the crime.

*Dassey v. Dittmann,* 877 F.3d 297, 332-33 (7th Cir. 2017) (Wood, J., dissenting). While the dissent in *Dassey* argues that this new understanding mandates a more stringent Fifth Amendment analysis, the majority concluded that without controlling Supreme Court precedent stating otherwise, it would not mandate new constitutional restraints. *Id.* at 318. Although acknowledging the seriousness of the potential false confession here, this Court is compelled by *Dassey* and the analogous case law discussed above to find that, even taking all factual issues in Abarca's favor, he cannot establish coercion as a matter of

law.  Accordingly, the Defendants' Motion for Summary Judgment
is granted.

## B.  Remaining Summary Judgment Relief

Because the Defendants have succeeded on their Motion for
Summary Judgment as to the underlying constitutional violation,
Defendant Franchini's Motion for Summary Judgment on the
qualified immunity claim and Defendant City of Chicago's Motion
for Summary Judgment on the respondeat superior claim are
granted.  Further, Abarca concedes he has not stated a claim for
malicious prosecution and, as such, Defendants' Motion for
Summary Judgment is granted as to that claim as well.

## III.  <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion for
Summary Judgment [ECF No. 26] is granted.

**IT IS SO ORDERED.**

_____
            Harry D. Leinenweber, Judge
            United States District Court

Dated:  3/29/2018